938 P.2d 1114

Kenneth Henry MUNROE and Mildred Munroe, Petitioners,

v.

The Honorable Frank T. GALATI, Judge of the Superior Court of the State of Arizona, in an for the County Of Maricopa, Respondent Judge,

GENERAL MOTORS CORPORATION and Ray Korte Chevrolet, Inc., Real Parties in Interest.

No. CV–96–0522–PR.

Supreme Court of Arizona, En Banc.

May 27, 1997.

Law Offices of Jim Robert Junker by Jim Robert Junker, Scottsdale, and Coben & Associates by Larry E. Coben, Garrett J. Olexa, Scottldale, for Petitioners.

Snell & Wilmer, L.L.P. by Richard W. Shapiro, Martha E. Gibbs, Phoenix, and McCutchen Doyle Brown & Enersen, L.L.P. by Leslie G. Landau, San Francisco, CA, and Strasburger & Price by R. Chris Harvey, Dallas, TX, for Real Parties in Interest.

Begam Lewis Marks & Wolfe, P.A. by Stanley J. Marks, Phoenix, and Trial Lawyers for Public Justice by Arthur H. Bryant, Washington, DC, for Amici Curiae Trial Lawyers for Public Justice, Public Citizen, Center for Auto Safety, Consumers for Auto Reliability and Safety.

Bowman and Brooke by Jill S. Goldsmith, Phoenix, and Product Liability Advisory Council by Hugh F. Young, Jr., Reston, VA, and Mayer Brown & Platt by Kenneth S. Geller, Erika Z. Jones, John J. Sullivan, Lily Fu Swenson, Washington, DC, for Amicus Curiae Product Liability Advisory Council, Inc.

## OPINION

FELDMAN, Justice.

Kenneth Munroe was rendered quadriplegic in a January 26, 1994 accident in Tempe. As he was driving his 1990 Chevrolet Corsica through the intersection of Rural Road and Broadway, another car turned in front of him, causing a front-end collision at relatively low speed. Because of alleged defects in the passive restraint seat belt, installed as part of a recall of the original defective system, Mr. Munroe was not restrained after the initial impact. The jerking movement resulting from the seatbelt's failure caused Mr. Munroe's spinal cord injury.

Mr. and Mrs. Munroe (Plaintiffs) filed a complaint against General Motors Corporation and Ray Korte Chevrolet, Inc. (Defendants), alleging liability on theories of strict liability, negligence, gross negligence, and breach of warranty. In their strict liability claim, Plaintiffs contend Mr. Munroe's injuries occurred because the combination of inadequacies in the seat belt design and the failure to equip or offer to equip the automobile with a supplemental driver's side air bag system made the vehicle defective and unreasonably dangerous. Defendants filed a motion for partial summary judgment to pre-

clude Plaintiffs from raising at trial the claim that the vehicle was defective for failure to provide an air bag along with the seat belt. Judge Galati granted the motion for partial summary judgment, stating that the claim of defect due to "the absence of alternative safety systems is preempted" by the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. § 1381 *et seq.* (the Act), and the language of Federal Motor Vehicle Safety Standard 208, 49 C.F.R. § 571.208 (hereinafter FMVSS 208), promulgated under the Act.

Because the grant of partial summary judgment did not dismiss all of Plaintiffs' legal theories, the judgment was not certified as final. *See* Ariz.R.Civ.P. 54(b). There being no adequate remedy by appeal, a petition for special action was filed in the court of appeals. *See* Ariz.R.P.Spec.Act. 1(a). After hearing oral argument, the court of appeals declined to accept jurisdiction.

## JURISDICTION

■ We have jurisdiction under Ariz. Const. art. VI, § 5(3) and Ariz.R.P.Spec.Act. 8. We have stated that as a general policy in Arizona, appellate courts should decline jurisdiction when a party seeks special action relief from denial of summary judgment. *See City of Phoenix v. Yarnell & Smith,* 184 Ariz. 310, 315, 909 P.2d 377, 382 (1995); *Ft. Lowell–NSS Limited Partnership v. Kelly,* 166 Ariz. 96, 99, 800 P.2d 962, 965 (1990). The rationale for declining jurisdiction in such cases is one of simple economy. Granting such special actions "often frustrates the expeditious resolution of claims, unnecessarily increases both appellate court caseload and interference with trial judges, harasses litigants with prolonged and costly appeals, and provides piecemeal review." *City of Phoenix,* 184 Ariz. at 315, 909 P.2d at 382.

■ These concerns are not present in this case; in fact, the special action may avoid further prolongation. This case does not involve the denial of summary judgment but, rather, the judge's failure to certify the grant of summary judgment under Ariz. R.Civ.P. 54(b). However, this is the rare case in which the policy concerns are substantially the same. The operative facts are undisputed. The issue, a pure question of law, turns on the meaning of words we used in a recent case. Thus, while "there is a substantial argument to be made over the adequacy of review by appeal . . ., the factors mentioned above and the resulting cost and delay to all parties if normal appellate procedures were utilized and the case then had to be retried militate in favor of exercising our discretion to accept jurisdiction." *University of Arizona v. Superior Court,* 136 Ariz. 579, 581, 667 P.2d 1294, 1296 (1983). Mr. Munroe is a 67–year–old quadriplegic. To apply our opinion in a recent case and avoid needless expense, time consumption, and lack of finality, we granted jurisdiction of this special action.

## DISCUSSION

Defendant argues that Plaintiffs' strict liability count, based on General Motors' failure to provide an air bag, is preempted and precluded because the regulations promulgated under the Act do not require the manufacturer to install air bags as part of an automobile's protective devices. We note at the outset the very important fact that the standards also do not prohibit the manufacturer from installing such air bags.

The preemption issue we consider today is the subject of a long series of opinions, two from this court and many from both the United States Supreme Court and federal circuit courts. Those interested in the history of this problem and the many authorities that have considered it are referred to *Hernandez–Gomez v. Leonardo,* 180 Ariz. 297, 884 P.2d 183 (1994) (*Hernandez–Gomez I* ). The United States Supreme Court vacated that opinion following its decision in *Freightliner Corp. v. Myrick,* 514 U.S. 280, 115 S.Ct. 1483, 131 L.Ed.2d 385 (1995), and ordered us to reconsider the matter. On reconsideration, we again concluded that Hernandez–Gomez' claim (failure to install a lap belt in addition to the two-point safety belt) was not precluded by the standards promulgated under the Act, even though those standards permitted the manufacturer to sell the car without the safety device and even though the plaintiff's claim of design defect was

based on the manufacturer's failure to do something not required by federal law. *Hernandez–Gomez v. Leonardo,* 185 Ariz. 509, 518, 917 P.2d 238, 247 (1996) (*Hernandez–Gomez II* ).

### A. The holding of *Hernandez–Gomez II*

We addressed the preemption issue in *Hernandez–Gomez II,* stating that "Volkswagen *could argue* that a state common-law tort claim, which alleges that a defective design failed to protect occupants in front-end accidents, is preempted if federal regulatory requirements for performance in front-end accidents are met." 185 Ariz. at 516, 917 P.2d at 245 (emphasis added). Defendants read this statement as an affirmative holding that in front-end collision cases, Plaintiffs are preempted by the federal safety standards from bringing a state common-law claim based on General Motors' failure to include an air bag along with the passive restraint system.

We disagree. First, the statement was merely a comment on Volkswagen's argument possibilities in frontal crash cases, not part of any holding. The next sentence reads: "Volkswagen cannot, however, make that preemption claim with regard to rollover accidents because the federal standard it chose did not address design or performance requirements for that type of accident." Taking the sentences together, it is apparent we said only that whatever the validity of Volkswagen's argument in frontal crash cases, it had no validity in the Hernandez–Gomez rollover case. This is not tantamount to saying, let alone holding, that the argument is valid.

Second, in *Hernandez–Gomez I* we were quite definite in finding there was no express preemption of state common-law claims by the federal regulatory requirements for safety systems. Absent express preemption, and given the savings clause, we found no preemptive effect at all, stating: "The text of the savings clause explicitly shelters common-law claims from preemption, expansively

providing that compliance with federal regulation 'does not exempt [one] from any liability under common law.'" 180 Ariz. at 304, 884 P.2d at 190, *citing* 15 U.S.C. § 1397(k) (savings clause).[1] We did not and therefore have not held in either Hernandez–Gomez case that the Act preempted state common-law tort claims. However, the United States Supreme Court granted certiorari in *Hernandez–Gomez I* and remanded for reconsideration in light of *Myrick,* in which it held that implied preemption may exist beyond the text of an express preemption clause in a statute. 514 U.S. at 284, 115 S.Ct. at 1486.

### B. Implied preemption

While noting that there was no express preemption of Hernandez–Gomez' claims and that the savings clause would ordinarily militate against establishing a preemption claim, in *Hernandez–Gomez II* we decided to engage in an implied preemption analysis. The reason for this was caution rather than federal judicial mandate. *See Hernandez–Gomez II,* 185 Ariz. at 514, 917 P.2d at 243. Because *Myrick* relied primarily, if not totally, on the absence of federal standards for anti-locking braking systems rather than application of the savings clause, it was unclear what the Supreme Court's position might be were *Hernandez–Gomez* to make another tour of the circuit. *Id.* In the interests of jurisprudential economy, as well as concern for parties involved in a case that had already been in litigation for five years, this court engaged in the implied preemption analysis. *Id.*

■ We stated in *Hernandez–Gomez II* that when the savings clause is read, as it must be, in conjunction with the preemption clause, it "prohibits a manufacturer from using federal safety standards to immunize itself from state common-law liability." 185 Ariz. at 514, 917 P.2d at 243; *see also id.* at 519–20, 917 P.2d at 243 and 248–49 (Martone, J. concurring). Thus, we said, our analysis could have ended there without any consideration of implied preemption. The effect of

---

1. When this accident occurred, the relevant section of the Act appeared at 15 U.S.C. § 1397(k) (1994 supp.). Congress revised the language and recodified this section at 49 U.S.C. § 30103(e), effective July 5, 1994. Because the parties' briefs referred to the prior sections and language, we use those citations.

the savings clause is strengthened by the presumption, acknowledged in *Myrick*, that when a statute addresses preemption its text defines preemptive reach and "implies that matters beyond that reach are not preempted." *See Myrick*, 514 U.S. at 288, 115 S.Ct. at 1488, *quoting Cipollone v. Liggett Group Inc.*, 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). *Myrick* holds that there may be implied preemption notwithstanding the limited reach of the express preemption clause. *Id.* at 288, 115 S.Ct. at 1488. We do not believe, however, that *Myrick* requires an implied preemption analysis of common-law claims in the present case. *Myrick* permits an inference that what is not within the textual reach of the preemption clause[2] is not preempted. *Id.* Thus, we read *Myrick*, which did not deal with the effect of the Act's savings clause, as recognizing that the textual limits of the preemption clause may foreclose a claim of broad implied preemption. We believe this is also true of the case before us. The savings clause applicable to the statute before us states that "[c]ompliance with any ... safety standard does not exempt any person from *any liability* under common law." 15 U.S.C. § 1397(k) (emphasis added). The plain language thus allows common-law claims against even those who have complied with the minimum safety standards promulgated by the Act.[3]

We are aware that there is contrary authority. The United States Court of Appeals recently held that the Act preempted and precluded claims that a vehicle was defective because the manufacturer failed to install an air bag. *Harris v. Ford Motor Co.*, 110 F.3d 1410 (9th Cir.1997). The majority reasoned that the Act's purpose was to create national uniformity, stating that the "unambiguous

federal policy ... would be frustrated if individual states could force manufacturers to install air bags." *Id.* at 1412 n. 3. We disagree with this view. As the dissent points out, "Congress was explicit about the purpose of the Safety Act. It was designed to promote vehicle safety by establishing federal standards, and the text reveals no other purpose." *Id.* at 1416 (Van Sickle, J., dissenting). In fact the text of the statute does not use the word "uniformity."[4] Congress stated its purpose in clear terms:

> Congress hereby declares that the purpose of this chapter is to reduce traffic accidents and deaths and injuries to persons resulting from traffic accidents. Therefore, Congress determines that it is necessary to establish motor vehicle safety standards for motor vehicles and equipment in interstate commerce; to undertake and support necessary safety research and development; ....

15 U.S.C. § 1381.

In using the term "safety standards," Congress made clear just what it meant:

> Motor vehicle safety standards " 'Motor vehicle safety *standards' means a minimum standard for motor vehicle performance*, or motor vehicle equipment performance, which is practicable, which meets the need for motor vehicle safety and which provides objective criteria."

15 U.S.C. § 1391(2) (emphasis added). These words tell us Congress gave the agency authority to adopt *minimum safety standards* to promote highway safety and reduce traffic accidents. Thus, we consider the standard as being just what Congress authorized: a minimum standard. If safety, not uniformity, is the underlying congressional

---

**2.** 15 U.S.C. § 1392(d) (1992 supp.) reads:
Whenever a federal motor vehicle safety standard established under this subchapter is in effect no State or political subdivision of a State shall have any authority either to establish, or to continue in effect, with respect to any motor vehicle or item of motor vehicle equipment of any safety standard applicable to the same *aspect* of performance such vehicle or item of equipment which is not identical to the Federal standard. Nothing in this section shall be construed as preventing any State from enforcing any safety standard which is identical to a Federal safety standard.

**3.** We do *not* address here the preemption claim that would be raised if Plaintiffs were seeking to impose common-law liability for General Motors' failure to do what federal law prohibited.

**4.** Although the word does not appear in the definition or purpose clause of the statute, we recognize a concern for uniformity was expressed in the congressional debate. *See* S.Rep. No. 1301, 89th Cong., 2d Sess. 4 (1966) U.S.Code Cong. & Admin.News 2709, 2712; H.R.Rep. No. 1776, 89th Cong., 2d Sess. 17 (1966).

purpose, the adoption of minimum standards would not ordinarily indicate that common-law liability imposed as a failure to adopt higher standards is precluded, or even in conflict with congressional intent. Nor does the exposure to common-law claims force the manufacturer to do anything.

Our main disagreement with *Harris* and other cases finding preemption of "no air bag" claims, however, pertains to the construction of § 1397(k), the savings clause. Congress' statement that "compliance with any federal motor vehicle safety standard ... does not exempt any person from common law liability" means that common-law liability claims would survive. It is difficult to imagine just what language Congress could have used to make the point more clear. The *Harris* majority explained the language of the savings clause by stating that it was true the clause said that "compliance ... does not exempt any person" from any liability under common law, but to "be exempted from liability, however, one must first be subject to it. And § 1392(d) [the preemption clause] removes the state's authority to subject anyone to liability for the breach of nonidentical safety standards." 110 F.3d at 1415. The majority therefore concluded that because manufacturers may still be held liable on such theories as defective manufacture, § 1397(k) means only that "compliance with federal standards does not exempt anyone from any liability that states have authority to impose." *Id.*

■ We do not find this explanation persuasive. Neither the Act, the standards promulgated under it, nor the preemption clause deals with or applies to manufacturing defects or designs not covered by the standards. As *Harris* recognizes, we must construe the savings and preemption clauses together, as one provision. *Id.* We think it quite clear that by including the savings clause Congress intended to forbid regulatory standards or requirements in conflict with federal law but did not intend to preclude claims of common-law liability based on a manufacturer's failure to exceed the federal minimum standards. This is the plain textual effect of § 1397(k).

Even if we were to see some ambiguity in the clause and therefore refer to the Act's legislative history, we could not agree with the *Harris* majority. The legislative history makes Congress' intent quite clear. The bill's sponsor, Senator Magnuson, addressed the very issue before us today: "Compliance with Federal standards would not necessarily shield any person from broad liability at the common law. The common law on product liability still remains as it was." 112 Cong. Rec. 14230 (1966). The Senate report states:

Federal minimum safety standards need not be interpreted as restricting state common law standards of care. Compliance with such standards would thus not necessarily shield any person from product liability at common law. . . .

Senate Report No. 1301, 89th Cong., 2d Sess. 1966, *reprinted in* 1966 U.S.C.C.A.N. 2709, 2720. The House committee report also noted:

*Common law liability.*—Section 108(c) [which eventually became the savings clause] of the reported bill provides that compliance with any Federal motor vehicle safety standard does not exempt a person from any liability under common law.

*It is intended, and this subsection specifically establishes, that compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability.*

House Report No. 1776, 89th Cong., 2d Sess. 24 (1966) (emphasis added).

In *Hernandez–Gomez II*, we reviewed the legislative history and stated:

We are mindful of the fact that the expressed intent of several congressmen is not necessarily determinative, and that these 'unenacted approvals, beliefs, and desires are not laws.' *See Puerto Rico Dep't. of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 501, 108 S.Ct. 1350, 1354, 99 L.Ed.2d 582 (1988). We believe, however, that when the sponsors of a bill and the very committees considering that bill tell Congress and the public what they intended to accomplish with a specific provision of that bill, such expressed inten-

tions can be useful to clarify any ambiguity in the meaning of the enacted legislation. 185 Ariz. at 513, 917 P.2d at 242. If there is any textual ambiguity, we believe statements of those individuals and committees that managed and heard the bill provide clear indication of their intent.

■ Thus, if some textual ambiguity makes legislative intent relevant, the Act's legislative history makes it plain that Congress meant just what it seemed to say. "The savings clause refers simply to 'the common law' with no restriction to a subset of that law, or to particular causes of action." *Harris,* 110 F.3d at 1417 (Van Sickle, J., dissenting). Further, as the dissent points out, the Supreme Court has held that a "presumption against the preemption of state police power regulations should be applied not only to determine whether Congress intended any preemption, but also to determine the scope of any express preemption.... [This] is 'consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety.'" *Id., citing Medtronic, Inc. v. Lohr,* —— U.S. ——, ——, 116 S.Ct. 2240, 2249–50, 135 L.Ed.2d 700 (1996).

We see no express preemption and no conflict that would implicate implied preemption of common-law claims. The automobile safety standards are minimum, mandatory requirements, implemented through authority granted by Congress to "reduce the number of deaths of vehicle occupants, and the severity of injuries, by specifying vehicle crash-worthiness requirements ... and by specifying equipment requirements for active and passive restraint systems." FMVSS 208 S2. Common-law liability does not impose mandatory requirements that manufacturers must follow; such exposure to possible liability, rather, allows manufacturers to make choices about cost. Even if a jury were to find the manufacturer liable for failing to provide air bags in addition to the passive restraints required by the minimum standard, the manufacturer would not be required to include that safety feature in its cars. If Plaintiffs' claim is successful, the imposition of liability would simply compensate them for injuries caused by General

Motors' choice not to do something the standards permitted it to do. *See Hernandez–Gomez II,* 185 Ariz. at 518, 917 P.2d at 247. As we stated before:

> Standard 208 sets out minimum safety standards that are uniformly applicable to all cars manufactured, whereas tort liability operates to encourage behavior but not require it. Manufacturers may weigh the risks and benefits and choose to live with the occasional lawsuit rather than change their behavior.

*Id.* We find no preemption, express or implied, of common-law tort claims based on a manufacturer's compliance with federal *minimum* standards and failure to provide safety devices permitted but not required by the Act.

### CONCLUSION

As in *Hernandez–Gomez II,* we believe 15 U.S.C. § 1397(k) does not allow a manufacturer to claim federal preemption to avoid state common-law liability claims in air bag cases. Finding no reason to search for implied preemption, acknowledging the lack of express preemption, reconsidering and again emphasizing the savings clause, we vacate the trial judge's order granting partial summary judgment and remand to the trial court for proceedings consistent with this opinion.

ZLAKET, C.J., JONES, V.C.J., and MOELLER and MARTONE, JJ., concur.